**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | |
|---|---|
| **GREAT WEST CASUALTY INSURANCE COMPANY and ATLANTIC SPECIALTY INSURANCE COMPANY**<br><br>　　　*Plaintiffs*,<br><br>**v.**<br><br>**DEXTER BURNS, QUANDRALYN PAUL, JAKE FAISON, and DUNAVANT SEA LANE EXPRESS, LLC,**<br><br>　　　*Defendants*. | **CIVIL ACTION NO. 5:19-cv-00006-TES** |

## ORDER

Before the Court for consideration are three motions for summary judgment filed by Great West Casualty Insurance Company ("Great West") [Doc. 54], Dunavant Sea Lane Express, LLC ("Dunavant") [Doc. 61], and Atlantic Specialty Insurance Company ("Atlantic Specialty") [Doc. 79]. Dunavant also filed a motion to dismiss Atlantic Specialty's Intervenor Complaint [Doc. 74].

This case involves a duty-to-defend dispute between two insurance carriers and the parties involved in the underlying state court suit arising out of an auto accident that occurred on March 4, 2018. Both Atlantic Specialty and Great West issued policies to Dunavant that may potentially cover the accident. Atlantic Specialty issued an insurance policy to Dunavant that provides non-trucking liability insurance coverage

for tractors owned or leased by Dunavant when those tractors are not in the business of trucking. Great West issued an insurance policy to Dunavant, which provided motor carrier liability coverage for Dunavant's commercial vehicle exposure, or in other words, when the tractors are involved in the business of trucking.

The case arose when Jake Faison, driving a Dunavant tractor, hit a car carrying Paul and Burns. No one disputes the accident occurred or the resulting injuries (for purposes of this suit). However, what is in hot dispute is whether Faison was engaged in the business of trucking when the accident occurred. As explained above, if Faison was engaged in the business of trucking, Great West will have to provide a defense and coverage. If Faison was not in the business of trucking, Atlantic Specialty will defend and cover the accident.

To exactly no one's surprise, Great West contends that its policy with Dunavant does not cover the accident, so that Atlantic Specialty should pay, and Atlantic Specialty takes the opposite position. Both insurance carriers have moved for summary judgment and a declaratory judgment saying they are not responsible for defending and indemnifying Dunavant. [Doc. 54-1, p. 16; Doc. 79-2, p. 20]. Dunavant believes that its policy with Atlantic Specialty covers the accident and requests the Court enter an Order finding Atlantic Specialty is required to defend and indemnify Dunavant for any liability. [Doc. 61-1, p. 17].

Because Faison had just begun his drive on the morning of the accident, the

evidence is mostly limited to Faison's statements as to where he was going, and the parties' attempts to either undermine or support those statements, obviously depending on whatever helps them the most. While the parties agree that Faison filled up on gas and was then driving back through Macon, they sharply disagree about where he was ultimately going leading up to the crash. A jury could reasonably determine that Faison was driving to Dunavant's terminal at the time of the accident so that he was engaged in the business of trucking. Likewise, a jury could reasonably find that Faison was on a personal errand when the accident occurred so that he was not engaged in the business of trucking. Accordingly, the Court is left with genuine issues of material facts regarding Faison's normal work pattern or operational routine on the morning of the underlying accident. Thus, as explained in greater detail below, the Court **DENIES** the motions for summary judgment. [Doc. 54]; [Doc. 61]; [Doc. 79]. The Court also **DENIES** Great West's motion to dismiss. [Doc. 74].

## BACKGROUND[1]

### A.      Faison's Actions Leading to the Accident

On Friday, March 2, 2018, Faison delivered his last load for the week for Dunavant and then drove to the Marathon Truck Stop at Exit 6 on I-16 to drop off his empty trailer for the weekend. [Doc. 65-2, Faison Depo., pp. 60:1—16]. Dunavant instructed Faison to pick up his next load for delivery on Monday at the Dunavant

---

[1] Unless otherwise noted, the Court relies on Faison's version of events leading up to the accident.

terminal in Savannah, but Faison did not recall where he was told he would be going. [*Id.,* p. 128:7—16]; [Doc. 61-3, ¶ 6]. Faison then drove to his home in Macon, where he parked his tractor for the weekend.

On Sunday, March 4, 2018, Faison did a pre-trip inspection of the tractor at his house and noted all his pre-trip inspections in his driver's log. [Doc. 65-2, Faison Depo., pp. 105:1—5, 126:11—16].  Around 9:00 a.m. that morning, Faison drove to Love's on I-75 to get fuel for his trip to Savannah. [*Id.,* pp. 56:17—57:8, 59:20—24, 91:15—25].[2] Faison only filled up with the bare minimum amount of fuel needed to complete his trips since he had to pay for any extra fuel. [*Id.,* pp. 92:22—93:3, 106:18—22].

After gassing up, Faison left Love's and drove north on I-75. Spotting traffic, Faison took Exit 160 off I-75 and onto Pio Nono Avenue in Macon. [*Id.*, p. 110:5—18]. While on Pio Nono Avenue, Faison decided he wanted to get something to eat. [*Id.*, p. 142:21—25]. So, Faison turned left off Pio Nono Avenue and headed west on Anthony road, where the accident occurred at approximately 9:30 a.m.  [*Id.,* pp. 61:4-14, 104:16-23, 110:5-18].

At the time of the accident, Faison intended to turn right off Anthony Road onto Mercer University Drive and head to Macon Seafood. [*Id.,* pp. 111:20-112:21, 116:12-15]. Faison testified that he "just wanted to get some food in him and keep going," that he

---

[2] Faison's wife was riding with him at the time of the accident. [Doc. 65-2, p. 57:9—13]. Faison had received verbal—but not written—permission from Dunavant to have his wife accompany him. [*Id.,* p. 57:21—25].

considered himself "under dispatch", and that he was "en route to get [his] trailer[, and] [o]n the way [he] was going to grab [himself] something to eat." [*Id.*, pp. 133:1-6, 112:13-14, 116:12-20]. But, Matt Hall, a terminal manager for Dunavant, contradicts Faison's account. He stated that Faison called him after the accident and told him he was running personal errands. [Doc. 86-2, Hall Aff., ¶¶ 1, 15].

Dunavant did not give Faison any specific instructions on March 4, 2018. [Doc. 65-2, Faison Depo., p. 114:15—23]. Two days after the accident, Dunavant fired Faison. [*Id.*, pp. 43:7—9; 52:6—10].

**B.    Faison's Normal Work Pattern**

Faison drove a road tractor leased to Dunavant for over a year before the accident. [*Id.*, pp. 77:18—78:3]; [Doc. 86-4, Cartwright Aff., ¶ 4].  Faison worked five days a week, delivering loads for Dunavant Monday through Friday. [Doc. 65-2, Faison Depo., p. 93:10—13]. During his employment, Faison would drive from Macon to Dunavant's terminal in Savannah to pick up his load and deliver it to his assigned destination. [*Id.*, pp. 79:21—25, 84:8—10]. According to Faison, if Dunavant was delivering a load in Atlanta at 1:00 p.m. on Monday, he would leave Macon on Sunday night, if he was not already in Savannah. [*Id.*, pp. 84:20—85:5]. Then, he would bring the load back to Macon, park and sleep in his truck, and leave Macon at 8:00 a.m. the next day (Monday morning) to deliver the load in Atlanta. [*Id.*, p. 87:5—10]. However, on the

date of this accident, Faison believed he was heading to Memphis, Tennessee, where he usually went on Mondays. [*Id.*, p. 113:23—114:11].

But, according to Hall, Faison's rendition of his normal routine is incorrect. Hall testified that when Faison had a load destined for Atlanta, he would normally and routinely travel down to Dunavant's terminal in Savannah earlier in the morning that same day to pick up his container and then he would drive directly to Atlanta. [Doc. 86-2, Hall Aff., ¶¶ 18—19].

Faison essentially had unrestricted use of his tractor so that he could have taken his bobtail tractor anywhere he wanted for any purpose on the day of the accident. [Doc. 65-2, Faison Depo., pp. 114:15—116:6]. Faison also had a personal car at the time of the accident.[3] [*Id.*, p. 131:9—16]. However, Hall stated he had to give Faison a ride on

---

[3] Through the affidavit of Karen Hjerpe, Dunavant alleges, among other things, that Faison's personal car was having mechanical issues around the date of the accident. [Doc. 61-3, Dunavant Sea Lane Express, LLC Aff., ¶ 10]. Atlantic Specialty objected to paragraphs 5 and 10 of Dunavant's affidavit, which state, "Faison then dropped his empty trailer off at the Marathon Truck Stop at Exit 6 off Interstate 16 for the weekend" and "Faison's personal vehicle was having mechanical issues around the date of and after the accident." [Doc. 69-1, pp. 3—4]. An affidavit used to oppose or support a motion for summary judgment "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant . . . is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Pace v. Capobianco*, 283 F.3d 1275, 1278-79 (11th Cir. 2002); *Martin v. Rumsfeld*, 137 F. App'x 324, 326 (11th Cir. 2005) (stating that when an affiant avers that his statements are based on personal knowledge, a district court is "bound to accept [such] statements as true, unless the context demonstrate[s] otherwise.") Here, Hjerpe did not aver the statements were made on personal knowledge and does not explain how she knows that Faison's car was having mechanical issues or how she knew Faison was going to keep his truck at the Marathon Truck Stop. *See generally* [Doc. 61-3]. Accordingly, the Court **SUSTAINS** Atlantic Specialty's objection to those portions of Dunavant's affidavit, and the Court will not consider paragraphs 5 and 10. However, as Dunavant has now supplied Hall's affidavit alleging Faison's car had mechanical issues on personal knowledge, the Court will still consider evidence that Faison's car was having mechanical issues at the time of the accident. Further, Faison has stated that he dropped his trailer off at the Marathon Truck Stop.

Tuesday, March 6, 2020—the day Faison was fired—because Faison's car was having mechanical issues. [Doc. 86-2, Hall Aff., ¶¶ 29—31].

Faison was paid a percentage of the container loads he delivered. [Doc. 86-4, Cartwright Aff., ¶ 8]. He was not paid by the hour, mile, or based upon whether he was on or off duty. [*Id.*]. Faison paid for the fuel when using the tractor for personal use. [*Id.*, ¶ 9]. Faison is only allowed to get fuel at two gas stations, Love's and Pilot. [Doc. 86-3, Faison Depo., p. 91:15—19].

## C.   Procedural History

### 1.   State Court Proceedings

On July 18, 2018, Quandralyn Paul and Dexter Burns, the two individuals Faison allegedly injured in the vehicle collision, each filed separate personal injury lawsuits in the State Court of Bibb County. [Doc. 34, p. 2]. In their respective state court complaints, Paul and Burns each contend that at the time of the accident, Faison may or may not have been "acting in the course and scope of his employment and in furtherance of the business of Dunavant." [Doc. 1, ¶ 25].

### 2.   Great West's Policy and Declaratory Judgment Action

Pursuant to Dunavant's insurance coverage under Commercial Lines Policy Number MCP11922D, "Great West contends that it has no obligation to defend or indemnify Defendant Faison in connection with the Negligence Actions as there is no coverage provided by the Policy, because Defendant Faison was not operating his road

tractor in Dunavant's business" at the time of the accident. [*Id.*, ¶¶ 31, 34]. Seeking a

declaratory judgment that it indeed has no such obligation, Great West filed the instant

lawsuit on January 4, 2019. [*Id.*, ¶ 34]. The Great West policy includes the following

relevant terms regarding coverage for leased autos:

**ADDITIONAL INSURED - LEASED AUTOS**

Additional Insured (Lessor) and Address:
**ANY LESSOR OF A "LEASED AUTO" OR ANY "EMPLOYEE", AGENT OR
DRIVER OF THE LESSOR WHILE THE "LEASED AUTO" IS USED IN YOUR
BUSINESS AS A "MOTOR CARRIER" FOR HIRE.**

Description of "Leased Auto(s)":
**ANY "AUTO" LEASED TO YOU WITH A DRIVER UNDER A WRITTEN
LEASE AGREEMENT.**

**A.     COVERAGE**

    **1.**     For a "leased auto", Who is an Insured is changed to include as an
"insured" the lessor named or designated in the SCHEDULE on this
endorsement. However, **the lessor is an "insured" only when the
"leased auto" is used in your business as a "motor carrier" for hire.**

**\*\*\***

**B.     ADDITIONAL INFORMATION**

    As used in this endorsement: "Leased auto" means an "auto" designated or
described in the SCHEDULE on this endorsement that is leased or rented
to you with a driver, including any substitute, replacement or extra "auto"
needed to meet seasonal or other needs, under a written Lease Agreement.

**\*\*\***

**SECTION VI - DEFINITIONS**

**\*\*\***

**P.     "Motor Carrier"** means a person or organization providing transportation
by "auto" in the furtherance of a commercial enterprise.

[Doc. 54-7, pp. 31, 76].

8

### 3.      Atlantic Specialty's Policy and Intervenor Complaint

Like Great West, Atlantic Specialty is a defendant in the lawsuits filed in the State Court of Bibb County. [Doc. 27-1, p. 2]. Atlantic Specialty issued an insurance policy to TGT Transgulf Transportation LLC d/b/a Trans Gulf Transportation with the following additional insureds: Dunavant Sea Lane Express, LLC and Dunavant Trans Gulf Transportation, LLC. [*Id*.]. On April 9, 2019, the Court granted Atlantic Specialty's motion to intervene in this matter because, as stated succinctly in Atlantic Specialty's motion, "[i]f the Court finds that Great West's Policy does not offer coverage because Faison was not operating his vehicle . . . for a business purpose, then Atlantic Specialty's policy will possibly be triggered." [Doc. 34, pp. 3—4 (citing [Doc. 27-1])].

The operative language of Atlantic Specialty's policy is:

**SECTION ONE**
**NON-TRUCKING LIABILITY INSURANCE COVERAGE**
\*\*\*
**PART I – COVERED TRUCKS**
Only those **Trucks** that the **Named Insureds** own or lease and that are listed on the **Schedule** and described on the **Certificate of Insurance** are **Covered Trucks** … No coverage will be afforded where any such **Truck** … is in the custody of, or is being operated by, any individual who is not a **Named Insured** under this Policy.

**PART II – WHEN AND WHERE SECTION ONE COVERAGE**
**APPLIES**
1.      **When Section One Coverage applies:**
         **Section One Coverage** does not afford full time protection. **Section One**
         **Coverage** only applies to **Losses** that occur within the effective date
         show[n] on the **Declarations** when a **Covered Truck** is **Non-Trucking.**
\* \* \*
**GENERAL POLICY DEFINITIONS**

\* \* \*

**Non-Trucking** means when a **Truck** is subject to an active **Permanent Lease** with a government regulated **Motor Carrier** and is either **Bobtail** or **Deadhead** and is operating solely for personal use unrelated to the business of Motor Carrier.

A **Truck** is not **Non-Trucking** when it is:

- being operated for an economic or business purpose, which includes trips for service and maintenance when service or maintenance is an expressed or implied requirement of a **Permanent Lease** with a **Motor Carrier**;
- being operated under the expressed or implied management, control, or dispatch (as defined by DOT regulations and case law precedents) of a **Motor Carrier**;
- in a **Layover**;
- returning to the **Truck's Primary Garage Location** subsequent to delivering a load; or
- attached to a **Trailer** loaded with property of any type.

\* \* \*

**Layover** means any interlude that takes place away from a **Covered Truck's Primary Garage Location** between or during load hauling assignments.

\* \* \*

**Named Insured** means the person or entity under **Permanent Lease** to the **Policyholder** who is protected by this insurance **Policy** and named on the **Certificate of Insurance**.

\* \* \*

**Primary Garage Location** means the home parking base for a **Truck** or the terminal from which the truck customarily obtains hauling assignments.

[Doc. 43, pp. 7—8, 10].

## DISCUSSION

### A.    Great West's Motion to Dismiss

In Great West's motion, it argues that the Court should dismiss Faison, Burns and Paul from Atlantic Specialty's Complaint because Atlantic Specialty did not serve its amended Intervenor Complaint on these defendants within the time allowed by

Federal Rule of Civil Procedure 4(m) and because Atlantic Specialty does not have good cause for its failure to perfect service. [Doc. 74-1, p. 3].

"Federal Rule of Civil Procedure 24(c) provides that a party filing a motion to intervene must comply with the service requirements contained in Federal Rule of Civil Procedure 5." *State of Ga. v. City of East Ridge,* 949 F.Supp. 1571, 1582 (N.D. Ga. 1996). Rule 5(a) states that a copy of every pleading filed "subsequent to the original complaint" must be served upon all other parties. Rule 5 also provides that Atlantic Specialty, an intervenor plaintiff, can use the Court's CM-ECF electronic filing system to serve any defendants whom Great West, the original plaintiff, had already served with its complaint. Fed. R. Civ. P. 5(b)(3); *State of Ga.,* 949 F.Supp. at 1582; *see also Frey v. Minter,* No. 4:18-CV-191 (CDL), 2019 WL 2450920, at *2 n.2 (M.D. Ga. 2019). Accordingly, Atlantic Specialty properly served Paul and Burns under Rule 5(b) by filing its intervenor complaint via the Court's filing system.

However, Faison—who is in default—has not been properly served by Atlantic Specialty. *See* [Doc. 34]. Normally, "no service is required on a party who is in default for failing to appear." Fed.R.Civ.P. 5(a)(2). However, because Atlantic Specialty "asserts a new claim for relief against" Faison (its own complaint for a declaratory judgment), Atlantic Specialty must serve Faison pursuant to Rule 4. [*Id.*]. This, it has not done.

However, out of an abundance of caution, the Court will exercise its discretion and allow Atlantic Specialty to have an additional **30 days** from the date of this Order to

properly serve Faison and file proof of service with the Court.[4] *See Henderson v. United States*, 517 U.S. 654, 662—63 (1996) (noting that the 1993 amendments to the Rules accorded courts "discretion to enlarge the 120-day period 'even if there is no good cause shown' ") (citing Fed.R.Civ.P. 4(m), Advisory Committee Note, 1993 Amendments).

Accordingly, the Court **DENIES** Great West's motion to dismiss [Doc. 74].

### B.    Summary Judgment Standard

The Court now turns to the three motions for summary judgment. Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine if the evidence would allow a reasonable jury to return a verdict for the nonmovant and a fact is material if it "might affect the outcome of the

---

[4] In its response to Great West's motion to dismiss, Atlantic Specialty argues that Great West also did not properly perfect service upon Faison. [Doc. 78, pp. 10—12]. Great West contends that Faison was served through Vicki Lovett, the property manager of the Days Inn, on February 6, 2019. "During his deposition Faison confirmed the above address was his residential address at the time of Great West's service. [Doc. 71-1, Faison Depo., pp. 71:16-72:5]. Faison also acknowledged that Vicki Lovett was the manager of the property where he lived, and that he received a copy of the summons and complaint following Great West's service upon Lovett. [*Id.*, pp. 72:22—73:1, 74:2—24] (Faison testified that he received the summons and complaint "[w]hatever date this thing came to Miss Vicky's [sic]," and went to the federal courthouse to "ask them what to do.").

Fed. R. Civ. P. 4(e)(2)(B) states that service may be perfected by "leaving a copy of each at the individual's dwelling or usual place of abode with someone of suitable age and discretion who resides there." Further, "[i]t is a rule of longstanding that Rule 4, regarding whether service has been properly effected, should be broadly construed, particularly where a defendant has received notice of the suit." *Velocity S'ports Performance Franchise Systems, LLC v. Extreme Fitness, Ltd.*, No. 1:05-CV-2143-BBM, 2005 WL 8155624, at *1 (N.D. Ga. Oct. 27, 2005) (citing *Nowell v. Nowell*, 384 F. 2d 951, 953 (5th Cir. 1967). In *Nowell*, the Eleventh Circuit noted that it is "settled that jurisdiction can be acquired over a defendant by leaving process with the landlady of the rooming house wherein the defendant resides" and that at least one court in New York considered a Hotel Manager as a resident of the hotel for the purposes of Rule 4. *Nowell*, 384 F. 2d at 952.

suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In considering this motion, "the evidence of the [nonmovant] is to be believed, and all justifiable inferences are to be drawn in [the nonmovant's] favor." *Id.* at 255. However, the Court need not draw "all possible inferences" in favor of the nonmovant. *Horn v. United Parcel Servs., Inc.*, 433 F. App'x 788, 796 (11th Cir. 2011).

The movant "bears the initial burden of informing the district court of the basis for its motion[] and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1292 (11th Cir. 2012) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant "to rebut that showing by producing affidavits or other relevant and admissible evidence beyond the pleadings." *Jones*, 683 F.3d at 1292 (quoting *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2012)).

## C.    Interpretation of the Relevant Coverage Provisions

All parties agree that Georgia law governs this dispute. Under Georgia law, "contracts of insurance are interpreted by ordinary rules of contract construction . . . Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent." *Lambert v. Alfa Gen. Ins.*, 660 S.E.2d 889, 891 (Ga. Ct. App. 2008). "However, if a

provision of an insurance contract is susceptible of two or more constructions, even when the multiple constructions are all logical and reasonable, it is ambiguous, and the statutory rules of contract construction will be applied." *Id.* (citing *Hurst v. Grange Mut. Cas. Co.*, 470 S.E.2d 659, 663 (Ga. 1996)). Ambiguities in a contract are "strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible." *Brown*, 508 S.E.2d at 745.

Here, the dispute centers on whether Faison was using his tractor in the furtherance of a business purpose when the accident occurred. Great West only offers coverage when the tractor is "used in [Dunavant's] business as a 'motor carrier' for hire." *See* [Doc. 54-7, pp. 31, 76]. Alternatively, Atlantic Specialty limits its coverage for "non-trucking" purposes and when "operat[ed] solely for personal use unrelated to the business of Motor Carrier." *See* [Doc. 43, pp. 7—8, 10]. These terms—which are capable of more than one reasonable interpretation—have routinely been examined by Georgia courts.

In *AXA Global Risks,* the Georgia Court of Appeals found that the driver was not engaged in the carrier's business, but rather a "personal errand", where the accident occurred over a long weekend after the driver completed his last run. *AXA Global Risks v. Empire Fire & Ins.*, 554 S.E.2d 755, 758 (Ga. Ct. App. 2001). Similarly, in *Redland,* the

Northern District of Georgia found that a driver that struck a pedestrian while driving

to a QuikTrip to park his tractor for the night was not operating his tractor in

furtherance of the motor carrier's business. *Redland Ins. Co. v. Ginosky*, No. 1:07-CV-

0202-JOF, 2009 WL 10669352 (N.D. Ga. Aug. 10, 2009). In determining that the driver

was not acting in the furtherance of the motor carrier's business, the courts in *AXA*

*Global Risks* and *Redland* assessed whether:

> (1) the driver was "under dispatch" as that phrase is used in the trucking
> industry;
> (2) there were any restrictions on the driver's activities during the time period he
> was not en route, here over the weekend; and
> (3) whether his trip was part of his regular work pattern or "operational routine."

*Redland Ins.*, 2009 WL 10669352, at * 5; *AXA Global Risks,* 554 S.E.2d at 746. Finding the

drivers did not meet any of these three criteria, the courts in *AXA Global Risks* and

*Redland* determined that "the essential nature of the driver[s'] trip[s] w[ere] personal;

[the drivers were] not engaged in any activity intended to further the trucking

company[s'] commercial interests; and the portion of the trip[s] when the accident

occurred w[ere] completely unrelated to the company[s'] business[es]." *Redland Ins.*,

2009 WL 10669352, at * 5; *AXA Global Risks,* 554 S.E.2d at 746.

　　Further, courts have not required all three factors to be present for the driver to

be operating in the motor carrier's business. The Eleventh Circuit has found "Georgia

law provides that a lessor may remain in the trucking business . . . if he is acting within

his normal 'work pattern' or 'operational routine' in furtherance of the interests of the

lessee/trucking company." *Occidental Fire & Cas. Co. of North Carolina, Inc. v. National Interstate Ins*., 513 F.App'x 924, 926 (11th Cir. 2013) (quoting *Liberty Mut. Fire Ins. v. Axis Surplus Ins.,* 669 S.E.2d 219, 221 (Ga. Ct. App. 2008).

In *National Interstate Ins*., the Eleventh Circuit found the driver's bobtailing to the "terminal was within his normal work pattern or operational routine as a trucker as defined by Georgia case law[;]" accordingly, the driver "was operating his covered tractor exclusively in [C & K's] business as a 'trucker'" when he got into an accident one-quarter mile from the terminal and was not on a personal errand. *National Interstate Ins*., 513 F. App'x at 927. In *Hotshot,* the court found the driver was still engaged in the trucking company's business and within his work pattern when, after making a delivery and while not presently under dispatch, the driver was en route to pick up another load when he was involved in an accident. *Hot Shot Express, Inc. v. Assicurazioni Generali, S.P.A.*, 556 S.E.2d 475, 476—79 (Ga. Ct. App. 2001). The court stated, "it cannot be said that the trip from Hialeah[, Florida] to the freight terminal in Ocala[, Florida] was not related to Hot Shot's business." *Id.* at 478.

With this relevant case law in mind, the Court considers whether Faison was using his tractor for a business purpose at the time of the accident. First, the easy factor: Faison had no restrictions on his driving on the day of the accident. However, whether

16

Faison was driving "in his operational routine" is not so easily determined.[5] Thus, the Court examines if there are genuine issues of material facts as to (1) whether Faison was operating in his normal work pattern by leaving Sunday morning for Dunavant's terminal and (2) whether Faison was on a personal errand at the time of the accident that took him outside of his normal work pattern.

### i.     Faison's normal work pattern

If Faison's version of events is to be believed, Faison's decision to leave earlier in the day, Sunday, did not take him outside his normal work pattern. Faison was instructed that he had his next load delivery on Monday, and Faison's normal work pattern was to drive his tractor Sunday to Dunavant's terminal to receive and perform his dispatch orders.

---

[5] For similar reasons, a question of material fact also exists as to whether Faison was under dispatch. Atlantic Specialty's policy states that a driver is "not non-trucking" (trucking) when it is dispatched, as defined by relevant caselaw and Department of Transportation regulations. [Doc. 43, p. 8]. Further, as noted above, whether a driver is dispatched is relevant in determining if a driver is operating in furtherance of the motor carrier.

In *Redland,* the Northern District of Georgia noted that "[i]n *Midwestern Indemnity Co. v. Reliance Ins. Co.,* 44 Ohio App. 3d 83, 87 (1998), the court found that a tractor was not 'dispatched' until it had hooked up its trailer and departed on its route." *Redland Ins.,* 2009 WL 10669352 at *7. Based on the Ohio court's ruling, the Northern District of Georgia found, a "truck has not been 'dispatched' until it has received its assignment and began the process necessary to complete it, whether that be picking up a load or driving somewhere at the carrier's direction to pick a load up." *Id.* If the Court followed the definition in *Redland,* then Faison may not be considered under dispatch because—although he received his dispatch orders—a fact question exists as to whether Faison was en route to the carrier's terminal to pick up his load. However, it is not dispositive to the Court's analysis whether he was or was not under dispatch. As noted in *Hotshot,* a driver is not required to be under dispatch to be engaged in the trucking company's business. *Hot Shot Express, Inc.,* 556 S.E.2d at 476—79. Further, as discussed below, issues of material fact exist as to whether Faison was operating in his normal work pattern which forecloses summary judgment.

While Great West argues Faison left earlier in the day than normal, this is not dispositive as to whether Faison operated outside of his normal work routine. Faison stated that he thought he was heading to Memphis, Tennessee, where he normally goes on Monday. Logically, if Faison thought he had to drive farther to deliver his load, then he would leave earlier in the day. But regardless of that inference, Faison's work pattern should not be so restrictively construed at the summary judgment stage that a slight deviation takes him outside of his routine for completing business-related activities since Faison did not have specific times when he was supposed to be working and not working.

Further, Faison stated he would drive down to Savannah night *if he was not already in Savannah*. [Doc. 65-2, Faison Depo, pp. 84:20—85:5]. Thus, it could have been part of his normal work routine to leave earlier in the day. Simply put, per Faison's account, Faison had a business need to drive his tractor to Savannah and was in the process of fulfilling that need in line with his normal routine.

However, if Dunavant's versions of the facts are to be believed, then a jury could find Faison was outside of his normal work pattern because Faison's normal work routine was to leave for Savannah on Monday and not Sunday. Thus, the Court finds there is a question of material fact as to Faison's normal work pattern.

ii.    **The fundamental nature of Faison's trip Sunday morning**

As the Court has determined Faison could have been within his work pattern in

18

deciding to drive to Savannah on Sunday morning, the Court turns to whether he was furthering the business interests of Dunavant at the time of the accident. First, the Court examines Faison's account, where he states he was just grabbing a meal on his way to Dunavant's terminal to pick up a load. The Fourth Circuit in *Forkwar* examined a comparable fact pattern and found:

> "[a]s the district court noted, Mahdi[, under dispatch,] was not "pursuing leisurely engagement nor engaged in some frolic [or] detour." Rather, he had received instructions from J & J to go to Jessup to pick up a load and was in the process of completing that task. Although Mahdi had decided just before the accident to stop for a meal before making his way to the warehouse, he was operating his vehicle at the time of the accident solely for the purpose of furthering J & J's commercial interests."

*See Forkwar v. Empire Fire & Marine Ins.*, 487 F.App'x 775, 780 (4th Cir. 2012). Similarly, Faison's personal errand to grab food does not change the essential nature of his trip. According to Faison, he was operating his tractor because he intended to head to Dunavant's terminal to pick up his load. Faison explicitly stated his primary motivation was "to grab me something to eat and keep going." [Doc. 65-2, Faison Depo., p. 112:13—14]. Therefore, this minor personal detour would not have altered the reason he was operating his tractor that morning, which was to further Dunavant's commercial interests by picking up a load in Savannah.

However, evidence in the record explicitly contradicts Faison's account and calls into question whether this trip was truly just a minor detour. Specifically, Hall testified that Faison told him he was using his tractor for personal use at the time of the accident.

Accordingly, Faison's intention may not have been to drive to Dunavant's terminal. Instead, Faison may have intended to drive to Macon Seafood—wait several hours for it to open—and then eat and return to his home before leaving for Savannah. Thus, genuine questions of material fact exist as to what Faison was doing the day of the accident and whether Faison's possible deviation to get food took him outside his normal work pattern.

Bottom line, a jury must decide whether Faison was engaged in the business of trucking or not. After a jury answers that question, the question as to which insurance company must defend and cover Faison and Dunavant gets very simple to answer.

## CONCLUSION

Based on the foregoing, the Court **DENIES** Atlantic Specialty, Dunavant and Great West's Motions for Summary Judgment [Doc. 54] [Doc. 61] [Doc. 79]. Further, the Court **DENIES** Dunavant's Motion to Dismiss Atlantic Specialty's First Amended Intervenor Complaint [Doc. 74]. Accordingly, the Court exercises its discretion under Federal Rule of Civil Procedure 4(m) and **ORDERS** Atlantic Specialty to properly serve Faison within **30 days** from this Order and file proof of service with the Court**.**

**SO ORDERED** this 28th day of May, 2020.

S/ Tilman E. Self, III
**TILMAN E. SELF, III, JUDGE**
**UNITED STATES DISTRICT COURT**